UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., AND ASSUREDPARTNERS OF TEXAS, LLC,    Plaintiffs, <br><br> v. <br><br> STONEBROOK INSURANCE, LLC, CHRIS D. WYCOFF, AND AUSTIN WYCOFF, <br><br>    Defendants, | CASE NO.: |

## PLAINTIFFS' VERIFIED COMPLAINT

Plaintiffs Arthur J. Gallagher & Co ("Gallagher"), and AssuredPartners of Texas, LLC ("AP") (collectively "Plaintiffs") hereby submit their Verified Complaint against Defendants Stonebrook Insurance, LLC ("Stonebrook"), Chris D. Wycoff ("Chris"), and Austin Wycoff ("Austin") (collectively, "Defendants").

## I.     INTRODUCTION

1.     In 2022, the Wycoff family sold their family-owned insurance agency (the Parkwood agency) to AP for over $3,000,000.00, only to steal back the very goodwill and client relationships they sold approximately three years later.  For the past several months Chris Wycoff has been using his employment with Plaintiffs to surriptitiously divert clients away from Plaintiffs and to his son Austin Wycoff and their new agency Stonebrook.  Chris and Austin have both violated their valid and enforceable restrictive covenants with Plaintiffs.  Chris has also used and disclosed Plaintiffs' confidential and trade secret information to assist Austin and Stonebrook with these unlawful actions.

2.      Effective upon the 2022 Parkwood agency sale to AP, Chris and his son Austin became employed by AP.  Chris, as the seller of the business, signed an Asset Purchase Agreement (APA) which contained reasonable and enforceable five year non-compete and non-solicitation restrictions, along with confidentiality obligations.  Austin, as a non-seller, signed AP's Restrictive Covenant Agreement (RCA) which contained reasonable and enforceable two year post employment non-solicitation/non-interference restrictions, along with confidentiality obligations.  These agreements and restrictions were necessary to protect the goodwill and value of the Parkwood agency business AP purchased along with AP's legitimate business interests.

3.      The terms of the 2022 sale also included a two year earn-out and, as a result, the Wycoffs had a financial incentive to retain the prior Parkwood agency clients at AP during this time.  However, in anticipation of the earn-out being paid in March of 2025, in which the Wycoffs received an additional payment of $527,175.00, the Wycoffs started their plan to deceptively steal the prevously sold Parkwood agency clients and move them from Plaintiffs to their newly formed agency, Stonebrook.

4.      They formed Stonebrook in January of 2025, two months before the earn-out was to be paid.  Then, two months after the earn-out was paid (June of 2025), Austin filed a certificate of amendment with the Texas Secretary of State listing him as the manager of Stonebrook.  Shortly therafter, Austin resigned from his employment with AP and began working full-time for Stonebrook.  However, Chris remained employed with AP (and then with Gallagher after Gallagher acquired AP in August of 2025).  Chris retained his employment with Plaintiffs so he would be well positioned to divert Plaintiffs' clients to his son at Stonebrook, without Plaintiffs knowing he was violating his non-compete, non-solicitation, and non-disclosure restrictions.

5.    In furtherance of this scheme, in September of 2025, Chris started forwarding compilations of AP confidential and trade secret information from his AP email to his personal email. This continued over the next several months:

| From: | Chris Wycoff <Chris.Wycoff@assuredpartners.com> |
|---|---|
| Sent: | Thursday, September 25, 2025 1:18 PM |
| To: | chris wycoff |
| Subject: | Comparisons |
| Attachments: | Book of Business - Parkwood1.xlsx; Lost Business - Parkwood1.xlsx |

| From: | Chris Wycoff <Chris.Wycoff@assuredpartners.com> |
|---|---|
| Sent: | Monday, October 13, 2025 1:26 PM |
| To: | agent1226@att.net |
| Subject: | FW: personal customer list |
| Attachments: | PL Client List Parkwood 4-1-24.xlsx; Parkwood Expiration List 4-1-24.xlsx |

| From: | Chris Wycoff <Chris.Wycoff@assuredpartners.com> |
|---|---|
| Sent: | Tuesday, November 25, 2025 8:29 PM |
| To: | chris wycoff |
| Subject: | FW: Parkwood Carrier Listing & Contingent Revenue by Carrier Listing |
| Attachments: | Hawksoft Policy Report.xlsx |

The attachments to these emails contain all the compilations of critical, non-public information needed to solicit and divert Plaintiffs' clients to Stonebrook, such as client names and contact information, carrier names, policy numbers, renewal dates, revenue, and commissions. There was no reason for Chris to forward this information to his personal email other than to use it to help himself, Austin and Stonebrook unlawfully compete with Plaintiffs.

6.    For at least the last 12 months, Chris and Austin have actively worked together to move Plaintiffs' clients to Stonebrook. Chris substantially reduced his efforts to write new business for Plaintiffs. Chris was likely diverting those prospective business opportunities to Austin and Stonebrook and only writing business through Plaintiffs that he could not write through Stonebrook. Many of Plaintiffs' clients that Chris serviced began cancelling or not renewing their insurance with Plaintiffs. It did not appear that Chris was making any efforts to retain or renew this business. When Plaintiffs questioned Chris about these issues, he provided Plaintiffs with false information regarding the reasons these clients were leaving. These concerns led Plaintiffs

PLAINTIFF'S VERIFIED COMPLAINT                                                    Page **3** of **32**

to investigate, which revealed the true reason Chris was not writing new business and that the clients he serviced were leaving Plaintiffs – that they were being diverted to Austin and Stonebrook.

7.      To further ensure that these clients were diverted from Plaintiffs to Stonebrook, Chris informed them that he was working for Stonebrook, even though he was still employed by Plaintiffs.  For example, on December 7, 2025, (while Chris was still employed with AP) one of Plaintiffs' restricted clients (client CCP) confirmed that Chris Wycoff at Stonebrook was its insurance agent:



8.      Chris diverted another restricted client (client RF) from Plaintiffs to Stonebrook. This client regularly communicated with Chris through the Stonebrook service email referenced

by restricted client CCP in the email above.  After Stonebrook attempted to write insurance for RF, the carrier informed the client that its insurance with Stonebrook as the agent was not accepted:



Then, the client asked the carrier to explain why and indicated that his Stonebrook agent said "everything is in order."  The carrier responded that they were waiting to hear back from the agent. The client intended to forward that email to Chris as the Stonebrook agent but accidentally sent it to Chris's AP email:



Chris quickly deleted this email from his AP inbox, hoping that AP would not be able to recover it, in a covert effort to cover his tracks.

9.    This scheme has now been exposed.  After Plaintiffs recently discovered Defendants' unlawful actions, they immediately terminated Chris's access to Plaintiffs' systems and information.  They then requested to meet with Chris to discuss these issues and provide him

an opportunity to offer an explanation. However, Chris knew his scheme was exposed and for several days claimed he was "not available" to talk to Plaintiffs. As a result, Plaintiffs terminated his employment effective March 18, 2026. Chris's refusal to speak with his then employer about these issues shows his culpability and shows that he has no intention of complying with his contractual obligations.

10.    Following the termination of Chris's employment, Plaintiffs received an additional notice that a client was changing its agent from Plaintiffs to Stonebrook, showing that Defendants intend to continue to steal Plaintiffs' clients in violation of their legal and contractual obligations:

**CHANGES TO POLICY - TRANSACTION    #    2**

**This Policy Change Endorsement Results In A Change In The Charges As Follows:**

No Change In Premium

**Description of Change(s)**

AGENT OF SERVICE IS ADDED ON BEHALF OF STONEBROOK INSURANCE, LLC EFFECTIVE 03/05/2026

See The Revised Declarations and Declarations Schedule

11.    There is no denying that Chris and Austin have been conspiring for over a year to steal back the very clients AP purchased in 2022 and Plaintiffs' new clients since that purchase. They have disclosed their intentions to clients but have worked hard to deceive and take advantage of Plaintiffs. Even Stonebrook's own website confirms that the Wycoff family own and operate Stonebrook (referring to Chris's 30-year experience in the industry):

**Our Story**

**A Legacy of Excellence**

Stonebrook Insurance Agency is a family-owned and operated insurance agency that has been serving clients in Texas and across the country for over 30 years. We started as a small, customer-focused agency in Texas with a passion for helping people and businesses protect their futures. As we grew, we never lost sight of what made us special: a commitment to providing comprehensive insurance solutions and a customer-first mentality.

https://www.stonebrookinsuranceagency.com/about

12.     Defendants' conduct has resulted in and will continue to result in Plaintiffs suffering actual damages and irreparable harm related to the loss of the purchased goodwill in the Parkwood agency, the loss of clients and prospective client relationships, and the loss of exclusive use of its confidential and trade secret information.  Plaintiffs seek the assistance of this Court to stop Defendants' unlawful scheme, require them to comply with their contracts and legal obligations through injunctive relief, prevent the ongoing tortious interference with Plaintiffs' contractual and prospective contractual relationships, award Plaintiffs actual and punitive damages, and award Plaintiffs their attorneys' fees and costs.

## II.     PARTIES, JURISDICTION AND VENUE

13.     Gallagher is an entity organized under the laws of the State of Delaware with its principal place of business in Rolling Meadows, Illinois, and includes its subsidiaries, divisions, affiliates, and related companies (including AP). Gallagher is a global insurance brokerage and risk management firm offering, among other things, property and casualty insurance services, bond and surety placements, and employee benefits insurance consulting to companies across many industries.

14.     AP is a Texas limited liability company, and its sole member and owner is AssuredPartners, Capital, Inc., a Delaware corporation with its principal place of business in Orlando, Florida. Gallagher acquired AP in August 2025 when it acquired AP's parent company in a stock purchase agreement following a Hart-Scott-Rodino (HSR) Act review and approval process. As part of the stock purchase agreement, Gallagher was assigned the right to enforce employment agreements between AP and retained employees, including Chris and Austin. AP continues to operate as a Gallagher subsidiary and also has the right to enforce agreements with employees.

15. Upon information and belief, Chris Wycoff resides at and can be served at 454 Long Cove Drive Fairview, Texas 75069 or wherever else he may be found.

16. Upon information and belief, Austin Wycoff resides at and can be served at 10646 Downy Cup Drive, Frisco, Texas 75035 or wherever else he may be found.

17. Stonebrook is a Texas limited liability company, with its principal place of business located in Texas.  Stonebrook conducts business in Frisco, Texas.  It can be served through its registered agent, Capitol Corporate Services, Inc., 1501 S. Mopac Expressway, Suite 220, Austin Texas 78746.

18. The contract interference and breaches by Defendants, their tortious conduct, and their misappropriation of trade secrets as described herein occurred in substantial part in and from Frisco, Texas.

19. Defendants are subject to the jurisdiction of this Court.

20. This Court possesses federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiffs are pursuing claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. ("DTSA").

21. This Court possesses diversity and supplemental jurisdiction over the claims in this case pursuant to 28 U.S.C. § 1332, and 28 U.S.C. §1367.  For the purposes of diversity jurisdiction, the citizenship of a limited liability company is determined by the citizenship of all of its members and not its state of formation and principal place of business.  *See FCCI Ins. Co. v. Marine Tech Servs.*, No. 4:20-CV-2716, 2021 WL 3377575, at *1 (S.D. Tex. July 6, 2021), *report and recommendation adopted,* No. 4:20-CV-2716, 2021 WL 3375943 (S.D. Tex. Aug. 3, 2021); *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008).  Plaintiffs are citizens of

Delaware, Florida and Illinois.  None of the Defendants are citizens of Delaware, Florida or Illinois.  Therefore, this controversy is between citizens of different states.

22.    This controversy exceeds the sum or value of $75,000.00 (exclusive of interest and costs).

### III.    FACTS

#### A.  AP's Valid and Enforceable Asset Purchase Agreement with Chris Wycoff.

23.    In 2022, AP purchased the Parkwood agency in an asset purchase agreement.

24.    Chris and his wife Amy, as principal sellers of Parkwood agency, received over $3,000,000.00 in exchange for their ownership interest, assets (including clients and confidential information), and goodwill in Parkwood agency.

25.    As part of this sale of business transaction, AP provided Chris with significant value including, but not limited to: (a) substantial payments provided under the Parkwood agency acquisition for the goodwill of the company, and (b) employment and access to AP's confidential and trade secret information related to clients, prospective clients, systems, platforms, and marketing data, in addition to other confidential and trade secret information.  In exchange for this valuable consideration, Chris agreed to sign an Asset Purchase Agreement (the "APA")[1] setting forth several industry standard and narrowly tailored restrictive covenants.

26.    In the APA, Chris promised to comply with reasonable restrictions related to the retention, use and disclosure of AP's Confidential information, including that he would maintain in confidence and not use or disclose any Confidential Information relating to AP's business:

---

[1] **Exhibit 1** is a copy of the restrictive covenant sections of the APA signed by Chris.  Some of the allegations in this Complaint summarize the restrictions in the APA and in no way limit the more fully defined terms, restrictions and definitions in the APA.

PLAINTIFF'S VERIFIED COMPLAINT                                   Page **9** of **32**

> **6.07**    Confidential Information.
>
>     (a)    Each Seller Party acknowledges that Buyer has legitimate and continuing proprietary interests in the protection of its Confidential Information (including the Confidential Information of the Agency Operations) and that Buyer has invested substantial resources (including the Purchase Price contemplated by this Agreement) and will continue to invest substantial resources to acquire, develop, maintain and protect such Confidential Information. Each Seller Party agrees not to disclose, furnish or make accessible to anyone or use for any purpose (other than as expressly contemplated hereby) any Confidential Information of Buyer, any Affiliate of Buyer or the Agency Operations, including information obtained by or revealed to such Seller Party during any investigations, negotiations or review relating to this Agreement and any other Transaction Document or any past or future actions taken in connection with, pursuant to, in accordance with, or under this Agreement.

(**Exhibit 1**, ¶6.07(a).)

27.    The APA reasonably defines Confidential Information to include client information, current and anticipated client requirements, expiration dates, insurance products and services provided to or proposed to clients, among other things.  (**Exhibit 1**, ¶1.15.)

28.    In the APA, Chris also promised to comply with certain post-employment obligations not to compete with AP for five years after the sale (through December 1, 2027) as follows:

> **6.08**    Restrictive Covenants.
>
>     (a)    Each Seller Party hereby agrees that it will not, and will not permit any of its respective Affiliates to, except on behalf of Buyer or Buyer's Affiliates, during the period beginning on the Closing Date and ending on the date that is the fifth (5th) anniversary of the Closing Date (the "Restricted Period"), directly or indirectly, for any reason, for its own account, or on behalf of, or together with or through, any other Person, whether as owner, principal, agent, advisor, shareholder, creditor, participant, partner, promoter, director, officer, manager, member, equity holder, employee, independent contractor, consultant, sales representative, insurance agent or broker or (without limiting the specific enumerations of the foregoing) otherwise:
>
>         (i)    own, control, manage, or engage or participate in the ownership, control or management of, or render services or advice to, or have a material financial interest in, or lend its name to, any business or Person (or any Affiliate of a Person that is) engaged in, or that is undertaking to become engaged in, in whole or in part the Business within the Restricted Area;

(**Exhibit 1**, ¶6.08(a)(i).)

29.    The APA reasonably defines the "Restricted Area" of the non-compete as Frisco, Texas and the geographic area within 100 miles of Frisco, Texas.  (**Exhibit 1**, ¶1.63.)  This geographic restriction covers the area where the Parkwood agency primarily conducted its business

operations in 2022 and where a substantial number of the Parkwood agency clients were located at the time of the sale, and thereafter.  However, the Restricted Area does not cover the entire geographic area where the Parkwood agency operated or had clients.

30.    The APA further sets forth Chris's obligation not to directly or indirectly solicit AP's Restricted Clients for the same five-year Restricted Period as the non-compete, stating that Chris shall not:

> (ii)    solicit, divert, accept business from, or service (or attempt any of the foregoing), directly or indirectly, for such Seller Party's account or the account of any other Person (other than Buyer or Buyer's Affiliates), during the Restricted Period, any Restricted Client with respect to Insurance Products or Related Services;

(**Exhibit 1**, ¶6.08(a)(ii).)

31.    The APA further narrowly defines "Restricted Client" as follows:

> **1.64**    "Restricted Client" means any one or more of the following:
>
> (a)    any Client of the Agency Operations;
>
> (b)    any Prospective Client within the twenty-four (24) months preceding the subject activity.

(**Exhibit 1**, ¶1.64.)

32.    The APA expressly states that these restrictions will inure to the benefit of and be enforceable by AP's successors, transferees, and assigns.  (**Exhibit 1**, ¶6.08(f) and ¶8.05.) Gallagher acquired ownership of AP on August 18, 2025.

33.    The APA requires Chris to indemnify AP for any and all losses related to the breach of these restrictive covenants in the APA.  (**Exhibit 1**, ¶7.02.)

34.    The APA is a valid and enforceable contract between Chris and AP (and its successors and assigns).    Chris has violated the terms of the APA resulting in damages to Plaintiffs.

**B.  AP's Valid and Enforceable Restrictive Covenant Agreement with Austin Wycoff.**

35.      In connection with AP's 2022 acquisition the Parkwood agency, Austin became an employee of AP and signed AP's Restrictive Covenant Agreement (RCA).[2]  As consideration for signing the RCA, Austin received initial employment and access to AP extensive confidential and trade secret information related to its clients, prospective clients, systems, platforms, and marketing data, in addition to other confidential and trade secret information.

36.      In the RCA, Austin promised to comply with reasonable restrictions related to the retention, use, disclosure and return of AP's Confidential information, including that he would maintain in confidence and not use or disclose any Confidential Information relating to AP's business:

(b)    Employee acknowledges and agrees that all Confidential Information is the sole and exclusive property of Company or, where appropriate, Employer Group. Employee agrees to comply with all Company or, where appropriate, Employer Group policies governing the use and protection of Confidential Information. Accordingly, both during and after employment with Company (whether such separation from employment is voluntary or involuntary), Employee shall not copy, duplicate in any way, use, or disclose to any third party, any Confidential Information for any reason other than as intended within the scope of Employee's employment.

(c)    Upon separation of employment for any reason, or at any other time upon request of Company, Employee shall immediately deliver to Company all documents, materials, and data (and copies thereof), in tangible, electronic, or intangible form, relating to the business of Company or Employer Group.

(**Exhibit 2**, ¶2(b) and (c).)

37.      The RCA reasonably defines Confidential Information to include client information, current and anticipated client requirements, expiration dates, and insurance products and services provided to or proposed to clients, among other things.  (**Exhibit 2**, ¶2(a).)

---

[2] **Exhibit 2** is a copy of the RCA signed by Austin.  Some of the allegations in this Complaint summarize the restrictions in the RCA and in no way limit the more fully defined terms, restrictions and definitions in the RCA.

38.     In the RCA, Austin also promised to comply with certain post-employment obligations not to solicit or interfere with AP's Restricted Clients for 24 months following his separation.  These restrictions included the obligations to not engage in the following conduct:

(i)     offer, sell, solicit, quote, place, provide, or renew, any Insurance Products or Related Services to any Restricted Client or Active Prospective Client; or

(ii)    service any Insurance Products or Related Services on behalf of any Restricted Client or Active Prospective Client; or

(iii)   request, accept, facilitate, authorize, execute, send, process, or submit a broker of record or agent of record letter on behalf of any Restricted Client or Active Prospective Client, which would change the broker or agent of record for any Restricted Client or Active Prospective Client from Company to any other third party; or

(iv)    take any action intended, or reasonably likely, to cause any Restricted Client or Active Prospective Client, to diminish its business with, or cease or refrain from doing business with, any member of Employer Group; or

(**Exhibit 2**, ¶3(a), subparagraphs (i) through (iv).)

39.     The RCA narrowly defines "Restricted Clients" as follows:

(b)     *Restricted Clients.* For purposes of this Agreement, "Restricted Client" means any client of Employer Group during the two years immediately preceding the date upon which Employee's employment with Company ends for any reason:

(i)     as to which Employee received any commission, bonus, fee or any other compensation; or

(ii)    for which Employee had material involvement in proposing, selling, quoting, placing, providing, referring, servicing, or renewing any Insurance Products or Related Services; or

(iii)   about whom Employee received Confidential Information and/or confidential or financial information belonging to such client.

(**Exhibit 2**, ¶3(b).)

40.     The RCA defines Active Prospective Clients as those Austin solicited, made proposals/quotes to, or received Confidential Information about in the last two years of his employment with AP.  (**Exhibit 2**, ¶3(c).)

41.     The RCA restricts Austin's ability to solicit, induce, or engage to perform services any employee of AP with whom he had a working relationship in the last two years of his employment with AP.  (**Exhibit 2**, ¶3(a)(vi).)

42.    Similar to Chris's APA, Austin's RCA contains language confirming that his restrictions inure to the benefit of and are enforceable by AP's successors, transferees, and assigns (**Exhibit 2**, ¶17) and that he is responsible for paying AP's attorney's fees and costs in the event he breaches the RCA (**Exhibit 2**, ¶20).  The RCA also contains tolling language extending the restricted time by the time of non-compliance.  (**Exhibit 2**, ¶6).

43.    The RCA is a valid and enforceable contract between Austin and AP (and its successors and assigns).   Austin has violated the terms of his RCA resulting in damages to Plaintiffs.

### C.  <u>Gallagher's Valid and Enforceable Employment Agreement with Chris Wycoff.</u>

44.    Gallagher acquired AP on August 18, 2025.

45.    Chris subsequently agreed to become an employee of Gallagher.  As a condition of such employment and in consideration for the payment of $500, on December 29, 2025, Chris signed Gallagher's Employment Agreement.   (**Exhibit 3**.[3])   In exchange for signing the Employment Agreement, Chris received employment with Gallagher, additional compensation, and access to Gallagher's extensive confidential and trade secret information related to clients, prospective clients, systems, platforms, and marketing data, in addition to other confidential and trade secret information.

46.    Chris's Employment Agreement with Gallagher contains restrictions substantially similar to the restrictions in AP's APA and RCA related to not using or disclosing confidential information.  (**Exhibit 3**, §6.)

---

[3] **Exhibit 3** is a copy of the Employment Agreement signed by Chris.  Some of the allegations in this Complaint summarize the restrictions in the Employment Agreement and in no way limit the more fully defined terms, restrictions and definitions in the Employment Agreement.

47.    Chris's Employment Agreement with Gallagher also contains restrictions substantially similar to the restrictions in AP's RCA related to not soliciting or interfering with Restricted Clients:  "For a period of twenty-four (24) months following the Termination Date . . . Employee shall not, directly or indirectly, solicit, divert, sell, refer, transfer, provide, place, handle, market, accept, aid, counsel or consult in the placement, renewal, discontinuance, or replacement of any [competitive insurance products] for any Protected Accounts or Prospective Accounts of the Company (as those terms are defined in Section 8 below)."  (**Exhibit 3**, §7.A.(i).)

48.    Protected Accounts are defined as any accounts Chris managed, regularly serviced, or received Confidential Information about in the last two years of employment with Gallagher. (**Exhibit 3**, §8.G.)  Prospective Accounts are defined as any entities with whom Chris had any of the following type of contact in the last year of his employment: submitted or assisted in the submission of a proposal, had material contact with, had/received confidential information about, or incurred travel/entertainment expenses that were reimbursed by Gallagher.  (**Exhibit 3**, §8.F.)

49.    Similar to Chris's APA and Austin's RCA, Chris's Employment Agreement with Gallagher contains language confirming that he is responsible for paying Gallagher's attorney's fees and costs in the event he breaches the Employment Agreement.  (**Exhibit 3**, §11.D.)

50.    The Employment Agreement specifically states that the restrictions do not replace prior contractual obligations and are in addition to the restrictions in any other agreements (including the APA).  (**Exhibit 3**, §12.A and §12.E.)

51.    The Employment Agreement is a valid and enforceable contract between Chris and Gallagher.   Chris has violated the terms of his Employment Agreement resulting in damages to Plaintiffs.

**D. Defendants' Violations of the APA, RCA, and Employment Agreement, Tortious Interference With Those Agreements, and Misappropriation of Plaintiffs' Confidential Information and Trade Secrets.**

52.    While part of the sale of the Parkwood agency included the initial payment of over $3,000,000.00, some money from the sale was held back through a two year earn-out.  As a result, the Wycoffs had a financial incentive to retain their prior agency clients at AP during this time.  However, in anticipation of the earn-out being paid in March of 2025, the Wycoffs started their plan to deceptively steal the back the Parkwood agency clients they had sold to Plaintiffs and move them to their new agency, Stonebrook.

53.    The Wycoffs formed Stonebrook in January of 2025, two months before the earn-out was to be paid.  Then, two months after the earn-out was paid (June of 2025), Austin filed a certificate of amendment with the Texas Secretary of State listing him as the manager of Stonebrook.  Shortly therafter, Austin resigned from his employment with AP and began working full-time for Stonebrook.

54.    Chris remained employed with AP (and then with Gallagher after Gallagher acquired AP).  Chris remained employed with Plaintiffs so he would be well positioned to divert Plaintiffs' clients and confidential information to himself and his son at Stonebrook, without Plaintiffs knowing he was violating his non-compete, non-solicitation, non-disclosure and trade secret obligations.

55.    In furtherance of this scheme, in September of 2025, Chris started forwarding compilations of AP confidential and trade secret information from his AP email to his personal email.  This surreptitious misconduct continued over the next several months.

56.    The confidential and trade secret information Chris sent to his personal email contained all the compilations of critical, non-public information needed to solicit and divert

Plaintiffs' clients to Stonebrook, such as client names and contact information, carrier names, policy numbers, renewal dates, revenue, and commissions.

57.　There was no reason for Chris to forward this information to his personal email other than to use it to help himself, Austin and Stonebrook unlawfully compete with Plaintiffs.

58.　For at least the last 12 months, Chris and Austin have actively worked together to move Plaintiffs' clients and prospects to Stonebrook.  As detailed in the Introduction section above, Chris substantially reduced his efforts to write new business for Plaintiffs after receiving the earn out from AP, began diverting clients and prospective clients to Stonebrook, intentionally did not work to renew these policies with Plaintiffs, and told clients and prospects that he was working as an agent of Stonebrook while he was still employed with Plaintiffs.

59.　Chris's lack of effort to make new sales and his lack of concern or effort related to the clients he serviced for Plaintiffs leaving led Plaintiffs to investigate his email activity and expose his misconduct.  After Plaintiffs recently discovered Defendants' unlawful actions, they immediately terminated Chris's access to Plaintiffs' systems and information.  They then requested to meet with Chris to discuss these issues and provide him an opportunity to offer an explanation. However, Chris knew his scheme was exposed and for several days claimed he was "not available" to talk to Plaintiffs.  As a result, Plaintiffs terminated his employment effective March 18, 2026. Chris's refusal to speak with his then employer about these issues shows his culpability and shows that he has no intention of complying with his contractual obligations.

60.　Following the termination of Chris's employment, Plaintiffs received an additional notice that a client was changing its agent from Plaintiffs to Stonebrook, showing that Defendants intend to continue to steal Plaintiffs' clients in violation of their legal and contractual obligations.

61.     Through Defendants' actions, Plaintiffs have suffered irreparable harm from the loss of its exclusive use of confidential and trade secret information, from the loss of clients and prospective clients, and from the loss of goodwill from the Parkwood agency acquisition. Plaintiffs have also suffered significant actual damages, including, but not limited to, the loss substantial revenue from the clients AP purchased in the 2022 Parkwood acquisition, in addition to other clients and prospective clients from after that sale.

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Breach of Contract)**
**(Against Chris and Austin)**

62.     Plaintiffs re-allege the allegations set forth above as if they are fully set forth herein.

63.     The APA, RCA and Employment Agreement (collectively "Agreements") are supported by valuable consideration, including substantial compensation, initial and continued employment, as well as access to confidential and trade secret information (including, but not limited to, information related to clients, prospective clients, systems, platforms, and marketing data).  In addition, Chris's APA is supported by a substantial sale of business transaction.

64.     The restrictions in these Agreements are reasonable in duration, scope, and geographic reach, are narrowly tailored, and reasonably necessary to protect Plaintiffs' legitimate business interests.   These business interests include Confidential Information, substantial relationships with Plaintiffs' existing and prospective clients, goodwill in the relevant market area, access to Plaintiffs' skilled and trained workforce, and their referral source relationships.

65.     Even assuming any of the restrictions in these Agreements were deemed overbroad, which they are not, they are subject to judicial reformation to prohibit further unlawful conduct and prevent further irreparable harm to Plaintiffs.

66.    Chris has breached his APA by providing competing services for Stonebrook and competing against Plaintiffs within the Restricted Area.  This conduct occurred while he was still employed by Plaintiffs and during the time he had contractual and fiduciary duties to Plaintiffs. Chris's conduct will not stop and he will continue to violate his contractual and legal obligations to Plaintiffs after his termination.

67.    Chris and Austin have breached the Agreements by engaging in conduct that has and will continue to result in the loss of Plaintiffs' Restricted Clients, Active Prospective Clients, Protected Accounts, and Prospective Accounts to Stonebrook, including the solicitation of, servicing of, and interference with Plaintiffs' clients and prospective clients on Stonebrook's behalf.

68.    Chris and Austin have breached the Agreements by encouraging Plaintiffs' Restricted Clients, Active Prospective Clients, Protected Accounts, and Prospective Accounts to cease or refrain from doing business with Plaintiffs in favor of Stonebrook.

69.    Chris and Austin breached their Agreements by coordinating Austin's resignation from AP and going to work for Stonebrook while Chris remained at Plaintiffs to divert clients, prospective clients, and confidential information to Austin and Stonebrook.

70.    Chris and Austin have breached the Agreements by taking, retaining, using, disclosing and misappropriating AP's Confidential Information.

71.    All of Chris's and Austin's conduct described above has occurred during his employment with Plaintiffs and within the restricted time periods in the Agreements, and is continuing.

72.    As a direct and proximate result of Chris's and Austin's actions, Defendants have caused and will continue to cause Plaintiffs to suffer damages, including, but not limited to, the

loss of their valuable client relationships, prospective client relationships, and confidential information.

73.    Plaintiffs do not have an adequate remedy at law and an injunction is necessary to stop Chris and Austin from further violating their Agreements and to stop Stonebrook from further tortiously interfering with Plaintiffs' contractual and business relationships.

74.    The public interest supports the entry of injunctive relief.

75.    Plaintiffs are entitled to an order tolling the restrictions in the Agreements based on the period of the violations by Chris and Austin.

76.    By reason of the foregoing, Chris and Austin are also liable to Plaintiffs for actual and consequential damages in an amount to be determined at trial.

77.    Because of these breaches of the Agreements, Plaintiffs have been required to retain counsel to prosecute their claims. Plaintiffs have agreed to pay their counsel for the reasonable attorneys' fees and expenses incurred on Plaintiffs' behalf in this lawsuit. Pursuant to the specific terms in the Agreements, the Florida's restrictive covenant statute, section 542.335, *Florida Statutes* (for Chris's APA), and the Texas Civil Practices & Remedies Code §38.001, Plaintiffs are entitled to recover their reasonable and/or necessary attorneys' fees and costs incurred in the prosecution of this lawsuit.

78.    Through the Agreements, Chris and Austin (along with Plaintiffs) agreed to waive any right to a trial by jury related to the claims between them in this action.

**SECOND CAUSE OF ACTION**
**(Tortious Interference with Contractual and Prospective Contractual Relations)**
**(Against all Defendants)**

79.    Plaintiffs re-allege the allegations set forth above as if they are fully set forth herein.

80.    Defendants have improperly diverted confidential information and business opportunities away from Plaintiffs, have interfered with Plaintiffs' relationships with their employees and Restricted Clients, Active Prospective Clients, Protected Accounts, and Prospective Accounts, and have solicited these clients and prospective clients to not conduct business with Plaintiffs and to instead move their business to Stonebrook.

81.    Defendants were aware of Plaintiffs' contracts and prospective contracts with their Restricted Clients, Active Prospective Clients, Protected Accounts, and Prospective Accounts, and have intentionally induced and intend to induce the breach of these contracts and prospective contracts.

82.    Austin and Stonebrook were aware of Plaintiffs' contracts with Chris and were aware that the contracts contained restrictive covenants related to Plaintiffs' Confidential Information, non-competition, Restricted Clients, Active Prospective Clients, Protected Accounts, and Prospective Accounts.   Despite this knowledge, Austin and Stonebrook encouraged, participated with, and benefited from Chris's violations of his APA and Employment Agreement.

83.    Chris and Stonebrook were aware of AP's RCA with Austin and were aware that this contract contained restrictive covenants.   Despite this knowledge, Chris and Stonebrook encouraged, participated with, and benefited from Austin's violations of his RCA.

84.    Because of Defendants' wrongful acts, Plaintiffs have lost and will lose: (a) the value of the purchased assets in the APA, (b) business opportunities; (c) the value of their trade secret and Confidential Information; (d) clients, prospective clients and employee relationships; and (e) Plaintiffs' client and market goodwill.

85.    Plaintiffs have no adequate remedy at law.

86.     Plaintiffs are entitled to the injunctive relief to stop the ongoing tortious interference with the Agreements.

87.     Plaintiffs are entitled to actual damages and compensatory damages against Defendants.

88.     Based on the willful, malicious and intentional misconduct of Defendants, Plaintiffs seek punitive damages against all Defendants.

## THIRD CAUSE OF ACTION
### (Misappropriation of Trade Secrets - Texas Uniform Trade Secrets Act)
### (Against All Defendants)

89.     Plaintiffs re-allege the allegations set forth above as if they are fully set forth herein.

90.     AP purchased the Parkwood agency through the APA, and, as a result, purchased the assets, client goodwill, confidential information, and trade secret information of the Parkwood agency.

91.     Plaintiffs also devote considerable resources and investment to protect their client goodwill, confidential information and trade secret information. Critical to Plaintiffs' success is their investment into the development and safeguarding of the confidential and trade secret information central to their business platforms. Through careful and consistent enforcement of lawful confidentiality policies and contractual obligations and implementing other physical and electronic security measures, Plaintiffs protect their prized assets – the trade secret and confidential information acquired and developed through continued investment.

92.     Plaintiffs devote substantial resources to the protection of information critical to the success of the business where the value of such information depends on it being maintained as confidential and used only for the benefit of Plaintiffs. As alleged herein, Plaintiffs treat such information as their trade secrets, which is non-public information concerning their clients,

PLAINTIFF'S VERIFIED COMPLAINT                                    Page **22** of **32**

prospective clients, and their relationship with Plaintiffs.  Plaintiffs' trade secrets include, but are not limited to:

(a)    The identities, goals, needs, strategic plans and account information of Plaintiffs' clients;

(b)    The identities, goals, needs, and preferences of individual decision makers employed by Plaintiffs' clients;

(c)    The amount of premiums and commissions paid and/or generated by the sale of particular products or services and/or by the sale of Plaintiffs' products or services to a particular client;

(d)    Insurance policy numbers and carriers;

(e)    Insurance and/or contract renewal timetables and renewal quotes for any Plaintiffs' client;

(f)    The terms (including, without limitation, pricing and billing information) of any contract between Plaintiffs and any of their clients; and

(g)    Data files, systems, working papers, reports, procedure manuals and modules.

93.    Plaintiffs developed, compiled, and acquired their trade secrets at great expense and through substantial efforts. Plaintiffs' trade secrets are not readily ascertainable in the insurance industry or in any type of trade or public directory or any other source.

94.    The misuse of Plaintiffs' trade secrets, whether through the improper disclosure or improper use, would cause significant damage to Plaintiffs through potential loss of business and business opportunity, loss of goodwill, loss of employees through unfair and unlawful means, damage to reputation, and other types of harm.

95.     As such, Plaintiffs take careful, deliberate actions at great expense to protect against the misuse or wrongful disclosure of their trade secrets. Plaintiffs have taken steps reasonable under the circumstances to maintain the secrecy of their trade secrets, such as: (a) emphasizing to employees the need to keep this information a secret; (b) requiring, as a condition of employment, that all employees promise not to use or disclose this information except in the performance of their duties for Plaintiffs; (c) having employees execute confidentiality and non-disclosure agreements that instruct them not to disclose, reproduce or use this information without Plaintiffs' consent; (d) distributing confidentiality policies that all employees must specifically acknowledge, as well as employee handbooks containing confidentiality requirements; (e) limiting access and/or restricting access to this information by employees on a need-to-know basis; (f) requiring unique usernames and passwords to access trade secrets on computer systems and databases; and (g) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on computer system, servers, and networks, encrypting laptops issued to employees, and requiring that trade secrets be kept in secure locations when not in use.

96.     Further, as part of Plaintiffs' efforts to protect trade secrets, Plaintiffs require insurance producers (such as Chris and Austin when they were employed) to execute a written confidentiality agreement whereby producers acknowledge they will have access to trade secrets, promise not to disclose trade secrets to anyone not authorized to receive it, and to confirm they will not use trade secrets except for legitimate business purposes for the benefit of Plaintiffs. Producers also agree that confidentiality obligations survive the termination of their employment relationship, that they will continue to treat trade secrets as confidential, that they will not disclose

trade secrets to any third party, and that they will not retain trade secrets. Finally, producers acknowledge that trade secrets are the sole and exclusive property of Plaintiffs.

97.    Because of the nature of the trade secrets, Plaintiffs' commitment to enforce their confidentiality agreements, the fact that the trade secrets derive value by virtue of being confidential, and the fact that the trade secrets cannot be obtained from public sources by competitors, Plaintiffs' trade secrets constitute trade secrets under state and federal law.

98.    In the course and scope of his duties for Plaintiffs, Chris had access to, regularly used, and was responsible for maintaining and safeguarding Plaintiffs' trade secrets from use and disclosure for any improper or competitive purpose.

99.    Chris misappropriated Plaintiffs' trade secret information by forwarding such information to his personal email to assist himself, Austin and Stonebrook in their efforts to compete with Plaintiffs.

100.    Defendants knew or should have known that the information Chris stole from Plaintiffs was trade secret information.  They used and permitted Chris to use this trade secret information nonetheless.  All Defendants have benefited from the misappropriation of Plaintiffs' trade secrets.

101.    Chris and Austin's actions were as agents of and were for the benefit of themselves and Stonebrook.

102.    Defendants' conduct is in violation of the Texas Uniform Trade Secrets Act, Tex. Civ. Practice & Rem. Code Ann. § 134A, *et seq.*("TUTSA").

103.    Defendants' misconduct has damaged Plaintiffs.

104.    The conduct at issue constitutes a violation of the TUTSA and will continue unless enjoined by this Court, as Plaintiffs are without adequate remedy at law and are threatened with

irreparable loss, injury, and damage.  Plaintiffs are entitled to injunctive relief as provided for in TUTSA.

105.    Plaintiffs are entitled to damages, including damages reflecting the actual loss caused by Defendants' misappropriation of Plaintiffs' confidential information, the unjust enrichment to Defendants, punitive/exemplary damages in an amount allowed by TUTSA, and reasonable attorney's fees and costs.

## FOURTH CAUSE OF ACTION
### (Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.)
### (Against All Defendants)

106.    Plaintiffs re-allege the allegations set forth above as if they are fully set forth herein.

107.    The DTSA forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

108.    "Trade secrets" include "all forms and types of financial, business, scientific, technical, economic or engineering information."

109.    During his employment, Chris had access to Plaintiffs' trade secrets, as described above.  He also sold the Parkwood agency client goodwill, confidential information and trade secret information to Plaintiffs.

110.    Defendants conspired to use and share Plaintiffs' trade secrets in concert with and on Stonebrook's behalf and/or misused this information to intentionally damage Plaintiffs.

111.    This information was related to multiple products or services used in, or intended for use in, interstate commerce.

112.    This information: (a) is not known outside Plaintiffs; (b) is known only by Plaintiffs' employees and others involved in the business; (c) is subject to reasonable measures to

PLAINTIFF'S VERIFIED COMPLAINT                                          Page **26** of **32**

guard the secrecy of the information, including the Agreements and other policies and practices described above; (d) is valuable; and (e) is difficult for others to properly acquire or independently duplicate.

113.    Defendants knew of the duties under the Agreements and the applicable policies to maintain the secrecy of Plaintiffs' trade secrets.

114.    Defendants misappropriated and used this information to cause Plaintiffs harm.

115.    Defendants misappropriated and used this information without Plaintiffs' knowledge, consent, or authorization to benefit themselves and Stonebrook in a manner that will cause irreparable harm to Plaintiffs.

116.    Defendants' actions constitute actual and continuing misappropriation in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA").

117.    The actions of Chris and Austin were as agents and employees of Stonebrook, were for the benefit of themselves and Stonebrook, and occurred with Stonebrook's encouragement, knowledge, and authorization.

118.    Plaintiffs have suffered damages and irreparable harm because of Defendants' breaches of the DTSA.

119.    Plaintiffs are entitled to recover actual damages and all damages authorized by the DTSA.

120.    Defendants have willfully and maliciously misappropriated Plaintiffs' trade secrets entitling Plaintiffs to an award of punitive/exemplary damages.

121.    Plaintiffs are entitled to recover their costs and attorneys' fees as a result of Defendants' misappropriation of their trade secrets.

122.    Plaintiffs' damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable and compensatory relief.

123.    The aforementioned Defendants' actions will continue to cause irreparable harm and damages to Plaintiffs.  Injunctive relief is required to prevent additional harm.

### FIFTH CAUSE OF ACTION
**(Breach of Fiduciary Duty)**
**(Against Chris Wycoff)**

124.    Plaintiffs re-allege the allegations set forth above as if they are fully set forth herein.

125.    Chris owed a fiduciary duty of undivided and unqualified trust, confidence, and loyalty to Plaintiffs by virtue of his employment with Plaintiffs.

126.    Chris breached his fiduciary duty to Plaintiffs during his employment, by, among other things, using Plaintiffs' confidential and trade secret information for Stonebrook and for his own personal gain, and by directly and indirectly soliciting, inducing, and diverting Plaintiffs' clients to cease doing business with Plaintiffs and to move their business to Stonebrook.

127.    Chris conduct was for the purpose of benefiting himself, his son, and Stonebrook to the detriment of Plaintiffs.

128.    Chris acted maliciously and with willful and wanton disregard for Plaintiffs' rights and property.

129.    Chris's actions were intentional, knowing, malicious and reckless, especially since he knew he sold the Parkwood agency and goodwill to Plaintiffs in exchange for promising to comply with industry standard restrictive covenant related to the sale of a business.

130.    As a direct and proximate cause of Chris's breach of his fiduciary duty, Plaintiffs have suffered and will continue to suffer irreparable harm, including, but not limited to, the loss of their confidential and trade secret information, and the loss of their client relationships.

131.    By reason of the foregoing, Chris is liable to Plaintiffs for actual, compensatory, and punitive damages in an amount to be determined at trial.

132.    Plaintiffs also seek all compensation paid to Chris during the time he was in breach of his fiduciary duty to Plaintiffs.

## V.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

(a)    Grant injunctive relief enjoining Chris from violating the non-compete restriction in his APA and from directly or indirectly owning, controlling, managing or engaging in activities or employment that are competitive with Plaintiffs' business within a radius of 100 miles from Frisco, Texas.

(b)    Grant injunctive relief enjoining Chris from violating the non-solicitation restrictions in his APA and from directly or indirectly soliciting, diverting, accepting business from any Restricted Client as defined in the APA (any client from the 2022 Parkwood agency acquisition and any Prospective Client of AP in the last 24 months);

(c)    Grant injunctive relief enjoining Chris from violating the non-solicitation restriction in his Employment Agreement and from directly or indirectly soliciting, diverting, selling, referring, transferring, providing, placing, handling, marketing, accepting, aiding, counseling or consulting in the placement, renewal, discontinuance, or replacement of any [competitive insurance products] for any Protected Accounts or Prospective Accounts of [Gallagher] (as those terms are defined in Section 8 of the Employment Agreement);

(d)    Grant injunctive relief enjoining Austin from violating the non-solicitation/non-interference restrictions in his RCA and from directly or indirectly offering, selling, soliciting, quoting, placing, providing, renewing or servicing any insurance product or

service to, or on behalf of, any Restricted Clients (using the definition of Restricted Clients in the ¶3(b) of the RCA), and from taking any action intended, or reasonably likely, to cause any Restricted Client to cease or refrain doing business with Plaintiffs;

(e)    Grant injunctive relief enjoining the Defendants from directly or indirectly tortiously interfering with Plaintiffs' business and contractual relationships with their employees, former employees, clients, and prospective clients;

(f)    Grant injunctive relief enjoining Defendants from directly or indirectly retaining, using, disclosing, possessing, misappropriating, or having access to Plaintiffs' Confidential Information (as that term is defined in the APA, RCA, and Employment Agreement). Also requiring Defendants to deliver to Plaintiffs' counsel all originals and copies of Plaintiffs' electronic and hard copy files, documents, information or other property in their possession, custody or control;

(g)    Because Stonebrook is acting in concert and participation with Chris and Austin, has coordinated efforts to steal Plaintiffs' clients, and given the fact that Stonebrook was started by the Wycoff family to steal the business they previously sold to AP, grant injunctive relief enjoining Stonebrook and its employees from directly or indirectly tortiously interfering with the Chris's and Austin's compliance with the Court's order;

(h)    Because Stonebrook is in active concert and participation with the other Defendants, grant injunctive relief enjoining Stonebrook from directly or indirectly tortiously interfering with Plaintiffs' business and contractual relationships, from encouraging or conspiring with Chris and Austin to violate or circumvent any injunctive relief ordered by this Court, and from soliciting, servicing, or accepting business from Restricted Clients, Active Prospective

Clients, Protected Accounts, and Prospective Accounts (as those terms are defined in the Agreements);

(i) Enter an order extending the restrictions in the APA, RCA, and Employment Agreement based on the period of Defendants' violations;

(j) Grant expedited discovery to be completed within 7 days of the Court's ruling for the purpose of an evidentiary hearing on a motion for preliminary injunction requiring Defendants to identify all Restricted Clients, Active Prospective Clients, Protected Accounts, and Prospective Accounts (as those terms are defined in the Agreements) with whom they have had contact on Stonebrook's behalf, for a competitive purpose, or to divert them away from Plaintiffs since January 1, 2025, and for each contact describe the nature of the contact, the date of the contact and the individuals involved in the contact. Also requiring the Defendants to produce all documents evidencing the communications described above;

(k) Grant Plaintiffs judgement against Defendants for actual, compensatory, consequential, and incidental damages in amounts to be determined at trial, together with pre-judgment interest;

(l) Award punitive and/or exemplary damages in amounts sufficient to punish Defendants for their conduct and to deter them in the future from engaging in such intentional, willful and wanton conduct, such as Defendants have displayed toward Plaintiffs in this case;

(m) Grant Plaintiffs all available statutory remedies under the TUTSA and DTSA;

(n) Grant Plaintiffs judgment against Defendants for all costs, attorneys' fees and other litigation expenses; and

(o)     Grant Plaintiffs such other and further relief as the Court deems just, equitable and proper.

Dated: April 3, 2026

Respectfully submitted,

By: */s/ David R. Anderson*
David R. Anderson
Texas Bar No. 24128388
danderson@fordharrison.com
**FORDHARRISON LLP**
1601 Elm Street, Suite 4000
Dallas, Texas 75201
Telephone: (214) 256-4700
Facsimile: (214) 256-4701

Jeffrey A. Lehrer* [Lead Attorney]
South Carolina Bar No. 16687
jlehrer@fordharrison.com

**FORDHARRISON LLP**
100 Dunbar Street, Suite 300
Spartanburg, South Carolina 29306
Telephone: (864) 699-1152
Facsimile: (864) 699-1101

* *Pro Hac Vice Admission Forthcoming*

**ATTORNEYS FOR PLAINTIFF**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

|  |  |
|---|---|
| ARTHUR J. GALLAGHER & CO., AND ASSUREDPARTNERS OF TEXAS, LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>STONEBROOK INSURANCE, LLC, CHRIS D. WYCOFF, AND AUSTIN WYCOFF,<br><br>    Defendants, | CASE NO.: |

## **VERIFICATION**

PERSONALLY APPEARED BEFORE ME, Giovanni Barragan, Personal Lines Department Manager of Arthur J. Gallagher & Co., who upon oath duly sworn, deposes, and states as follows:

I have reviewed Plaintiffs' Verified Complaint in the above-captioned case.  Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Dated this the 2nd day of April, 2026.

*Giovanni Barragan*
———————————————
Giovanni Barragan

## :- Intellistack

## 🔒 Document Completion Certificate

| | |
|---|---|
| Document Reference: | 747d3f5e-3092-41c8-a39a-3050357ae932 |
| Document Title: | Wycoff Complaint Verification |
| Document Region: | Northern Virginia |
| Sender Name: | Giovanni Barragan |
| Sender Email: | giovanni.barragan@assuredpartners.com |
| Total Document Pages: | 1 |
| Secondary Security: | Not Required |

Participants:

1. Giovanni Barragan (giovanni.barragan@assuredpartners.com)

### Document History

| Timestamp | Description |
|---|---|
| 04/02/2026 05:20PM US/Eastern | Sender downloaded document. |
| 04/02/2026 05:21PM US/Eastern | Document sent by Giovanni  Barragan (giovanni.barragan@assuredpartners.com). |
| 04/02/2026 05:21PM US/Eastern | Email sent to Giovanni  Barragan (giovanni.barragan@assuredpartners.com). |
| 04/02/2026 05:22PM US/Eastern | Document viewed by Giovanni  Barragan (giovanni.barragan@assuredpartners.com). 170.85.101.21 Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/146.0.0.0 Safari/537.36 Edg/146.0.0.0 |
| 04/02/2026 05:22PM US/Eastern | Giovanni  Barragan (giovanni.barragan@assuredpartners.com) has agreed to terms of service and to do business electronically with Giovanni  Barragan (giovanni.barragan@assuredpartners.com). 170.85.101.21 Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/146.0.0.0 Safari/537.36 Edg/146.0.0.0 |
| 04/02/2026 05:22PM US/Eastern | Signed by Giovanni  Barragan (giovanni.barragan@assuredpartners.com). 170.85.101.21 Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/146.0.0.0 Safari/537.36 Edg/146.0.0.0 |
| 04/02/2026 05:22PM | Document copy sent to Giovanni  Barragan (giovanni. |

US/Eastern                  barragan@assuredpartners.com).

04/02/2026 05:22PM          Document copy sent to Giovanni  Barragan (giovanni.
US/Eastern                  barragan@assuredpartners.com).